THE PEOPLE OF THE STATE OF NEW YORK ex rel. JACK JACOBS, Relator, *v.* HARRY J. WORTHING, Superintendent of the Pilgrim State Hospital, Brentwood, Long Island, New York, and Others, Respondents.

Supreme Court, Nassau County, March 23, 1938.

*Herbert E. Rosenberg* [*Oscar Murov* of counsel], for the relator.

*John J. Bennett, Jr., Attorney-General* [*Francis X. Wazeter, Deputy Attorney-General,* of counsel], for the Pilgrim State Hospital.

CUFF, J. Application for the release of petitioner on a writ of habeas corpus from Pilgrim State Hospital where he is confined as an insane person. A hearing was held in Part II, Nassau County. The evidence overwhelmingly favors the release.

There was a sharp conflict between the patient and the hospital staff over the right of the former, while in the institution, to com-

municate by mail with attorneys. The incident cannot be passed unnoticed.

The Commissioner of Mental Hygiene, evidently pursuant to section 10 of the Mental Hygiene Law, has promulgated General Order No. 11, which, in part, provides as follows:

" 2. Whenever a patient in a State institution has a guardian or committee of his or her person and estate, lawfully appointed, mail matter addressed to or by such patient should be disposed of according to the written directions of such guardian or committee; and only in special or extraordinary cases need such mail matter be forwarded to the department."

That regulation means that the disposition of the mail matter of inmates, for whom a committee is serving, is subject to the written direction of that committee. It denies to patients the right to correspond directly with their attorneys. That prohibition, the evidence at the hearing indicated, is rigidly enforced and as a consequence the committee is in complete control of the situation in so far as patients writing to or receiving letters from lawyers is concerned. In the event that the committee happens to be unsympathetic to the idea of the patient seeing an attorney, efforts by the inmate to reach his lawyer by mail may easily be blocked and, what is worse, the patient may never know why the lawyer to whom his letters were addressed failed to reply. Equally in the dark in the case of a designing committee would be the lawyer who wrote to the patient, for he would never know that his letters had been intercepted by the committee and were not seen by the patient at all. Under these conditions it is beyond the realm of imagination to visualize a committee who, realizing that his improper management of the estate, his selfish interests, his incorrect advice given the patient and his illegal ambitions, would be in danger of discovery if the patient has the benefit of an attorney's counsel, simulating the signature of the patient to a typed letter and sending that letter to the attorney in reply to one from him addressed to the patient, and by the false message contained in such spurious communication removing the threat of discovery?

The facts in this case may be pertinent. A stroke of paralysis injured petitioner's brain as well as his arm. He was committed and has been confined for over four years. His wife is the beneficiary under a disability insurance policy, and is receiving a monthly allowance, which will continue only so long as her husband remains disabled. She also succeeded him, to some extent at least, in the position with an insurance company which he had held before his commitment. Her job, it was said, would terminate were her husband released and rehired. Whatever letters the patient dis-

patches by depositing them in the ordinary mail receptacles at the institution, pursuant to General Order No. 11, are forwarded to his wife because, as has been pointed out, she is his committee and has so directed. She also has received that mail which petitioner unsuccessfully tried to smuggle out.

The wife has not visited petitioner in over a year. She explained that her visit in January, 1937, her last, was an unpleasant experience, which seemed to aggravate his condition. In this she was supported by the doctor from the hospital. It should be stated that the patient's wife was not instrumental in having him committed. She said, at the hearing, that she was not opposed to his discharge but wanted it to occur in the ordinary course upon the recommendation of the staff. Released in that way, she said, she would be ready to take him home, but to any other kind of discharge she could not lend approval.

The injury to petitioner's arm has cleared up. He says that there remain no ill effects of the paralysis. The doctors from the hospital disagreed with him on the latter point.

The petitioner testified that, although he had tried, he had been unable to interest his wife in obtaining a lawyer to help him in his quest for freedom. From a time early in his confinement he has sought his release from the hospital; endeavoring at all times to communicate his plight to lawyers by " smuggled mail." He finally succeeded in interesting his present attorney.

It is not the purpose of this memorandum to suggest that petitioner's wife connived to keep the patient in the hospital. There is no evidence of that. The facts have been recited merely to focus attention upon the circumstances that kept this patient out of touch with his attorney (except by smuggling letters) for four years.

There may be reasons why patients of State institutions should be denied the right to communicate with lawyers. Those reasons do not occur to me nor have any been called to my attention. Lawyers are safe, sensible and trustworthy to deal with. They are accustomed to handling intricate problems and the more delicate the situation the more readily the lawyer, because of his experience, befits any case seeking to arrive at a solution of the difficulty.

There are many weighted reasons why communicating with lawyers should be allowed and even encouraged. To name one, an attorney would render the institution, the department and the State a signal service by exposing a plot to detain a patient illegally.

If the rule which prohibits letters to lawyers were adopted to reduce the annoyance and trouble incidentally caused by answering writs of habeas corpus, the cure prescribed is a dreadful expedient. Indeed, it marks the beginning of a dangerous practice.

The writ of habeas corpus is the one process which opens the way to the unfortunate who is unlawfully imprisoned. We might pause and consider events in parts of Europe in this supposed enlightened age. Concentration camps (prisons) seethe with their prisoners who know not why they are being held. The formality of filing a complaint and charges has been dispensed with. Hearings for the imprisoned ones have been abandoned. Probably that ordinary procedure which is an insurance against unlawful imprisonment, born of mistake or design, annoys and irks those modern administrators. They have no time for such details while they inflict a governmental scheme upon people, which lacks constancy and varies much as the restaurateur alters his menu from day to day, except that the latter seeks by his changes to satisfy the appetites of his customers, while the former seek by the speedy changes that they make, to stifle criticism and punish dissenters to the end that their hold upon the government, if it can be called that, be perpetuated at all costs.

It is the writ of habeas corpus that frustrates the plans of the official given to such excesses. Fear of its operation stays the merciless hand of the oppressor. In those countries where the abuses referred to abound, the famous writ must be out of the reach of the persecuted, for we read that they are wasting away in the prisons and that no relief is in sight.

It might be interesting to discuss here the methods followed in the lands of the dictators in nullifying the writ of habeas corpus to see if they bear any relation to the instant case, but that is not important. The disturbing fact is the result, viz., that the writ in those places has ceased to function.

How Americans detest anything that smacks of deprivations of that kind, when meted out by officialdom. Liberty loving people have been constant in their demand that the habeas corpus writ, which requires the captor to produce his captive in court and explain the reason for the detention, be kept available to them. They fought grimly over centuries to win that right. One shudders to even think of its slight curtailment.

Our Constitution calls the writ of habeas corpus a privilege and commands that it " shall not be suspended, unless when, in cases of rebellion or invasion, the public safety may require its suspension." (N. Y. Const., art. 1, § 4.) The same language is repeated in the United States Constitution (Art. 1, § 9). That historic and sacred writ together with the benefits to be derived from its operation should never be circumvented.

Perhaps General Order 11 was not intended to accomplish indirectly that which the law of the land forbids by direct action.

Partially at least, that is its net result. Diverting all mail of inmates through the committee fails to take into account that the committee, usually a near relative, may have an interest such as would prompt him to hope for a continuance of the detention of the patient.

That General Order 11 allows letters to go unexamined to the Governor, Attorney-General, judges of courts of record, district attorneys and officers of the Hygiene Department, serves certain purposes but leaves much to be desired. This petitioner carried on some of that restricted correspondence. He even prepared an application for a writ of habeas corpus. It all availed him nothing. Those named officials are not equipped to treat with such complaints and, of course, there must be some inmates who lack the skill to write convincingly. To them that limited privilege is without substance.

The exception is too restrictive. It should be remembered that the institution wherein the inmate is detained and the department in charge thereof are a part and parcel of the Governor's State administration. The head of the Department is in his cabinet. The Attorney-General is the Department's lawyer. District attorneys may act only when a crime has been committed and judges have no right to initiate proceedings on behalf of any one. The Hygiene Department and its officials may be the ones complained against. They might want to suppress the facts.

It would seem, therefore, that some to whom uninspected mail may be sent could use the letters to further an injustice and prevent detection of a wrong. The others listed have only a passing interest in such matters because of the limitations imposed by law upon their activities.

An inmate with a grievance against the officials of the Hygiene Department and others conspiring with them finds little solace reading his rights under General Order 11 and would in all likelihood abandon his complaint.

The query suggests itself. Why is that one person, who is wholly free to act; who is fully equipped by training and experience to investigate; who is ready and willing to serve (even at times, as in this case, without compensation); who is bound by his oath to give his all to the cause that he espouses; who has the right to appear in court and possesses the power to produce the results desired — the attorney at law — omitted from that group to whom inmates may send unexamined mail?

To the lawyer the retainer would be his exclusive obligation. To the public officials named, the patient's letter would be just another complaint, which, bearing the postmark of an institution for the insane, would be greatly prejudiced.

Depriving a person confined in a large institution where the insane are housed, of the right to send a letter to a lawyer of his own choosing in my opinion, imposes an unreasonable restraint upon him never contemplated by the law, the lifting of which might well be tried.

The application for the writ of habeas corpus is granted. The order will be settled on notice.